**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BARBARA ANDERSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-CV-05761 |
| | ) | |
| VILLAGE OF GLENVIEW; et al. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case presents an unfortunate but not unfamiliar saga: divorced parents warring over custody of their children. Here, the custody battle has spawned a federal civil rights case in which the plaintiff, Barbara Andersen, claims that she was arrested, held overnight, and prosecuted on trumped up stalking charges in a ploy engineered by her ex-husband, defendant Rick Gimbel, to deprive her of custody of their children. Andersen alleges that Gimbel carried out his plan with the assistance of his boss Dr. Morris Kharasch, Detective Jacob Popkov of the Village of Glenview police department, and the Village of Glenview (the other defendants in this case). After Andersen prevailed at the criminal trial (she was acquitted on the only charge that was not dismissed beforehand), she filed the 12-count, 273 paragraph *pro se* complaint at issue in this case. All four defendants have moved to dismiss the complaint for failure to state a claim, and Andersen has moved to strike exhibits on which those motions rely. Andersen's motion to strike is granted in part and denied in part. Gimbel's motion to dismiss is denied. The Village's and Popkov's joint motion to dismiss is granted as to the claim against the Village but denied as to the claim against Popkov. Kharasch's motion to dismiss is granted.

# BACKGROUND

## I.   Facts[1]

Barbara Andersen, a real estate attorney, and Rick Gimbel, an emergency room surgeon, divorced in 2009 and entered into a joint custody agreement regarding their two children. In 2015, for reasons somewhat unclear but immaterial, Gimbel allegedly started to harass Andersen by sending unsolicited e-mails and threatening to file frivolous domestic complaints against her with the police. Compl. ¶ 23. Gimbel, who had met several Village of Glenview police officers through his job as an ER doctor, frequently bragged about using these connections. *Id.* at ¶¶ 18, 27. Andersen reported this "cronyism" and harassment to the Glenview Police Department on several occasions during the summer of 2015 but the harassment continued. Gimbel also prevented Andersen from contacting the children when they were with him. *Id.* at ¶¶ 28, 41. Andersen responded on August 2, 2015 by leaving Gimbel "several voicemails"—actually eight within a span of about three hours—demanding access to the children. *Id.* at ¶ 29; Village and Popkov's Memorandum in Support of Motion to Dismiss, ECF No. 34, Ex. 1. Andersen also reported Gimbel to the Glenview police department and left a message for his supervisor Dr. Kharasch in which she complained that Gimbel was harassing her. Compl. ¶¶ 30-31.

On September 6, 2015, Andersen learned that Gimbel had advised their minor son that Anderson was "mentally ill." *Id.* at ¶ 41. She "became angered and called several people to intervene and stop Gimbel from harassing her." *Id.* at ¶ 42. (In fact, Andersen made a barrage of calls in the span of several hours on September 6, in which she left seven messages on Gimbel's

---

[1] The truth of facts alleged in the complaint are presumed true for purposes of this motion. *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 634 (7th Cir. 2012). They are supplemented where indicated with information included in exhibits to the motion of defendants Popkov and the Village of Glenview, which are properly considered by the Court for the reasons set forth in the discussion of Andersen's motion to strike, *infra* p. 7-8.

voicemail, three on his mother's, and three on his brother's. Village and Popkov's Memorandum in Support of Motion to Dismiss at Ex 4.) The gist of these messages was a demand that Gimbel's family stop bad-mouthing Andersen to her children; in one of the calls to Gimbel, Andersen stated, "you're dead, you're dead." Andersen sought to press charges against Gimbel but was told by police officers that her complaint was civil in nature and that she should take the matter up in the domestic relations division. Andersen then returned to domestic relations court where she filed a motion for a protective order. Compl. ¶¶ 37-38.

After Andersen's messages on September 6, Gimbel filed his own complaint of harassment with the Glenview Police Department and submitted recordings of the voicemails left by Andersen. Andersen contends that the Police Department, because of its bias in favor of Gimbel, took his complaints more seriously and made no effort to investigate her side of the story. *Id.* at ¶ 40. The investigation was assigned to Detective Popkov, and he and Gimbel exchanged multiple e-mails discussing the possibility of bringing criminal charges against Andersen. *Id.* at ¶ 48. Popkov allegedly acted in a biased fashion by "collecting forensically unsound evidence and failing to look for and/or secure exculpatory evidence." *Id.* at ¶ 55. Andersen also alleges, however, that the Police Department interviewed Dr. Morris Kharasch, Gimbel's boss, about the reported cronyism. *Id.* at ¶ 53. Kharasch allegedly offered a "negative and defamatory opinion" that Andersen was mentally ill. *Id.* at ¶¶ 53-54.

Events came to a head on Thursday, September 10, 2015. Gimbel had requested several times to have custody of the children on September 11, 2015 in order to take them to a football game in Champaign-Urbana, Illinois; Andersen was scheduled to have custody that day and had refused Gimbel's requests. Andersen alleges that Gimbel had then threatened to "effectively kidnap the children." *Id*. at ¶ 50. In an email exchange between Andersen and Gimbel on the

evening of September 9, Andersen told Gimbel: "Due to your threat to steal the children Friday [September 11] you will have no further access until your designated time." *Id.* at Ex. 20. Gimbel forwarded this email to Detective Popkov a few minutes later, writing: "Going to be interesting on Friday if barb is not arrested." *Id.*

Early in the afternoon on September 10, 2015, Popkov (along with another unidentified officer) went to Andersen's home, and she allowed them to enter. *Id.* at ¶ 59. Popkov "gave the impression" that the officers were there to discuss a minor harassment charge stemming from Gimbel's complaint, and apparently rebuffed Andersen's explanations. *Id.* at ¶ 64. Then, over her objections, he arrested Andersen without specifying a precise charge. Popkov did not secure a warrant prior to making the arrest. *Id.* at ¶ 58.

Popkov took Andersen to the police station and placed her in an interrogation room at about 1:30 p.m., where she signed a *Miranda* warning waiver.[2] *Id.* at ¶ 68; Village and Popkov's Memorandum in Support of Motion to Dismiss at Ex. 4, police interview video time stamp. After a period of questioning, Popkov informed Andersen that he was contemplating charges related to felony stalking and Andersen's 2014 destruction of one of the children's phones.[3] Early in the interview, Popkov asked Andersen whether she thought her behavior had been rational, to which she replied, "No, but I was mad." Village and Popkov's Memorandum in Support of Motion to

---

[2] Andersen seems to allege that she would not have signed the waiver had she known she was in custody for a potential felony charge. Popkov, however, was under no constitutional obligation to inform her of the specific reason for her arrest. *See Devenpeck v. Alford*, 543 U.S. 146, 155 (2004) ("While it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required.").

[3] In 2014, Gimbel had filed a complaint against Andersen for destroying a phone he had purchased for one of the children. Compl. ¶ 22. Andersen was not formally charged with destruction of personal property at that time or at any time during the underlying criminal case at issue here. *Id*. at ¶¶ 62, 89.

Dismiss at Ex. 4, police interview video at approx. 19:50. When Andersen later requested to be released so that she could pick up her children from school, she was told that she would be detained overnight and that Gimbel would pick up the kids. Compl. at ¶¶ 70, 71. Andersen immediately asked to speak to Popkov's supervisors and a State's Attorney. She also "requested access to a telephone to attempt to seek counsel" but was told to wait because a State's Attorney would be coming to the station. *Id.* at ¶ 74. After several hours, Andersen learned that the State's Attorney had arrived and was interviewing Gimbel and other witnesses. *Id.* at ¶ 75. At that point, Andersen "demanded to be charged, processed by the police, given access to a telephone, and placed in the overnight detention cell." *Id.* Popkov reacted to these demands, Andersen alleges, with "a twisted form of amusement." *Id.* at ¶ 76. At around 7 p.m., Andersen was processed and given access to a phone, but was unsuccessful in contacting an attorney. She was then confined in a cell until the following morning.

At the bond hearing the next day (September 11, 2015), the State's Attorney (who is not alleged to have been part of the scheme) approved a criminal complaint, signed by Popkov on behalf of Gimbel as complainant, for felony stalking. Andersen alleges that Popkov signed the complaint despite knowing that the charge was unfounded. *Id.* at ¶ 87. As evidence, Andersen points to an e-mail between Popkov and Gimbel dated September 9, 2015 in which Popkov wrote, "Showing up early for scheduled custody transfer most likely won't constitute stalking."[4] *Id.* at Ex. 18. Andersen also alleges that Popkov falsely stated in the verified complaint and during the subsequent grand jury hearing that her voicemails to Gimbel "were of a threatening/disturbing

---

[4] The e-mail also instructs Gimbel to create a list of incidents which could show Andersen's mental state and that "[s]ome aspects of the incidents probably would be criminal in nature, which will be dealt with through criminal court, however the vast majority of the incidents would most likely serve you best in your civil case." Compl. Ex. 18.

nature." *Id.* at ¶ 87. She alleges that, on the basis of "derogatory mental health comments made by Popkov, Gimbel, and Kharasch," the State's Attorney "attacked" her mental health and persuaded the judge to impose as a condition of release that Andersen submit to a mental health examination.[5] *Id.* at ¶ 91. Andersen was released on bond the same day on the condition that she submit to a psychiatric examination. The bond court also ordered that the children would live with Gimbel until further order of the domestic relations court. Later that month, a grand jury indicted Andersen on two counts of felony stalking and one count of felony telephone harassment with intent to kill.[6] *Id.* at ¶ 94.

Before the criminal case went to trial, Andersen and Gimbel returned to the domestic relations court. There, the judge stated that it felt Gimbel was setting Andersen up and that there was "a grand master plan" of eliminating Andersen's custody over the children. *Id.* at ¶ 108. The court then ordered the immediate return of the children to Andersen. Gimbel continued to harass Andersen and to make derogatory comments about her mental health to third parties. *Id.* at ¶ 113.

Meanwhile, in preparation for trial, Andersen submitted FOIA and subpoena requests to Eric Patt, the attorney for the Village of Glenview, but was met with "obstructionist" responses. *Id.* at ¶ 137. On July 18, 2016, the State nolle prossed the two stalking counts after a ruling by an Illinois appellate court held the statute unconstitutional. On November 29, 2016, allegedly in response to Andersen's filing of a motion to dismiss, the State reduced the count of felony telephone harassment with intent to kill to a count of misdemeanor telephone harassment. A bench

---

[5] In addition, Andersen alleges that Popkov fabricated an arrest report for disturbing the peace the following year after the two had a verbal altercation at a local Starbucks. Compl. at ¶ 146. Andersen reported the event to a superior at the Police Department who explained that it was "not actually an arrest report" and that Popkov was instructed to avoid Andersen.

[6] According to the Village and Detective Popkov, the "intent to kill" aspect of the charge arose from the September 6 voicemail in which Andersen stated, "you're dead, you're dead." Village's Memorandum in Support of Motion to Dismiss at Ex. 1.

trial was held in June 2017 on the misdemeanor telephone harassment charge, and the court found Andersen not guilty. *Id.* at ¶ 170. Andersen filed the complaint in this case shortly thereafter, on July 14, 2017.[7]

All four defendants moved to dismiss the complaint. Andersen subsequently moved to strike exhibits attached to the defendants' motions and it is there that the Court's analysis will begin.

## MOTION TO STRIKE

Popkov and the Village attached to their motion to dismiss: (1) recordings of voicemails left by Andersen to Gimbel on August 2, 2015, and to Gimbel and some of his family members on September 6 and 8, 2015; (2) a video recording of Andersen's police interrogation; and (3) Gimbel's complaints to police and the subsequent police reports detailing pre- and post-arrest evidence collection. Gimbel attached the same police reports to his motion to dismiss.

Generally, a district court must convert a motion to dismiss into a motion for summary judgment if it considers matters outside the pleadings. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Conversion is not required, however, if the extrinsic exhibits are "referred to in the plaintiff's complaint and are central to her claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). That said, courts should not consider exhibits requiring authentication or disambiguation through discovery. *Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002).

Andersen does not dispute that the voicemail recordings and interrogation tape are "central to her claim." Indeed, Popkov's alleged reliance on her voicemails to "manufacture a stalking

---

[7] Andersen filed the complaint in the Circuit Court of Cook County. The defendants removed the case to this Court based on federal question jurisdiction.

charge," falsely arrest her, and maliciously prosecute her is a major component of her claims against Popkov and Gimbel. Compl. ¶ 29. So, too, the videotaped interrogation, during which Andersen realized that "the Glenview Police Department had pre [sic] and co-planned the arrest of [Andersen] with Gimbel" and the interviewing officers allegedly "made several biased, inappropriate and derogatory comments" about Andersen's mental health. *Id.* at ¶ 71. This alleged conspiracy is another central aspect of Andersen's claim. Rather, Andersen contends only that the Court should not consider the voicemail recordings or police reports because they are not "concededly authentic."[8] Specifically, she argues that the original files were destroyed prior to the criminal trial and that Gimbel admitted at trial to altering the audio files prior to tendering them to the police department.[9]

Andersen's argument that the voicemails may not be authentic misses the mark. As the Village points out, Andersen does not allege that Popkov had any reason to believe that the voicemails had been inappropriately tampered with before Gimbel gave them to the police department. Because the test for probable cause is "what the police know, not whether they know the truth," *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir. 1994), Gimbel's handling of the audio files before giving them to the police is immaterial absent allegations, which the complaint lacks, that Popkov knew that the content of the recordings was not authentic. Further, Andersen makes no argument that she does not recognize the attached voicemails, that she did not make the statements contained in voicemails, or that the voicemails were from a different date than as

---

[8] Andersen makes no argument regarding the videotape except for her general proposition that extrinsic evidence should not be considered on a motion to dismiss. Because the videotape of the interrogation is referenced in the complaint, central to her claims, and concededly authentic, the motion to strike that exhibit is denied.

[9] Andersen's complaint alleges that Gimbel re-named and re-formatted the original audio files. Compl. at ¶ 55. It does not allege that the content of the files was altered.

labeled. In other words, she does not dispute that the voicemails are what the defendants say they are: evidence (previously altered or not) tendered to the police and relied upon by Popkov when deciding to arrest Andersen and when signing the criminal complaint. For those reasons, the motion to strike is denied as to the voicemails.

As for the police reports, Andersen argues that they should not be considered because 1) they are inadmissible hearsay and 2) the complaint alleges falsification of police reports. Defendants argue that the reports are not hearsay because they are not offered for the truth of the matters asserted, but rather to explain what Popkov considered before arresting Andersen.[10] But that is true only as to some of the information included in the reports; many of the matters asserted in the reports— "Gimbel showed [Popkov] eight voicemail messages he received from Andersen," for example—are indeed offered for their truth. Village and Popkov's Memorandum in Support of Motion to Dismiss at Ex. 3. In other words, it is only if the statements are true (*i.e.,* that Gimbel did in fact show Popkov the voicemails) that they support the defendants' argument that Popkov had probable cause.

Additionally, defendants do not address Andersen's point about alleged falsification. As another court in this district noted, police records cannot be considered "concededly authentic" where a complaint "alleges that the Defendants manufactured evidence against the Plaintiff." *Gardunio v. Town of Cicero*, 674 F. Supp. 2d 976, 985 (N.D. Ill. 2009). Here, Andersen's complaint specifically alleges that Popkov engaged in perjury and "manufactured a fictitious

---

[10] The defendants do not argue that the police reports are subject to the public records hearsay exception, Fed. R. Evid. 803(8), presumably because the exception applies only if "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Here, Andersen maintains that Popkov's report is inaccurate and the Court must accept that truth of that assertion in the context of a motion to dismiss. The Court's ruling in the context of this motion to dismiss, however, does not preclude the defendants from seeking the admission of these records at trial.

police report" to protect himself from civil litigation. Compl. ¶ 146. Because the authenticity of the attached reports is therefore in question, it would be improper to consider them when assessing the pending motions to dismiss. Certainly at this stage the Court cannot accept the truth of the events set forth in Popkov's arrest report. Andersen's motion to strike the police reports is accordingly granted. For the above reasons, however, the Court will consider the voicemail recordings and the interrogation video.

## MOTION TO DISMISS

The Court turns now to defendants' motions to dismiss. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has "facial plausibility" where the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering a motion to dismiss, the Court construes all inferences in favor of the plaintiff. *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 634 (7th Cir. 2012). That said, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In evaluating the defendants' motions to dismiss, it is important to understand that Rule 12(b)(6) speaks of the dismissal of claims, not legal theories. A claim is a collection of facts that could entitle the plaintiff to relief under some legal theory. But plaintiffs are not required to identify in the complaint the legal theory, or theories, on which they wish to proceed; the complaint need only set forth "a short and plain statement of the claim showing that the pleader is entitled to

relief." Fed. R. Civ. P. 8(a);[11] *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir.2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery."). It follows, then, that there is no penalty to be imposed for invoking the wrong theory in the pleadings. *King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014) ("A complaint need not identify legal theories, and specifying an incorrect theory is not a fatal error."). "[T]he critical question is whether the plaintiffs have stated a plausible claim for relief under some recognized legal theory, not whether they have properly labeled that theory."). *Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 997 (N.D. Ill. 2013).

Nevertheless, plaintiffs often set forth their legal theories in different "counts" and defendants often attempt to shoot down those theories in motions to dismiss some or all of those counts pursuant to Rule 12(b)(6) for "failure to state a claim." That is the practice that the parties have followed in this case. After setting forth 170 paragraphs of fact allegations, Andersen then sets forth her legal theories in 12 "causes of action," each of which incorporate all of the preceding paragraphs (including those set forth in any of the preceding "causes of action"), premised both on federal constitutional violations and violations of state law. Andersen maintains that in the course of her arrest and subsequent processing, Detective Popkov violated her First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights (Count VI) and deprived her of her constitutional right to parent-child society (Count III).[12] She also maintains that Popkov violated her Fourth and Fourteenth Amendment rights, and Illinois common law, by maliciously prosecuting her (Counts IX and VIII). Additionally, Andersen asserts that Popkov and Gimbel conspired to deprive her of

---

[11] Plaintiff's 273 paragraph complaint pushes the boundaries of what may be considered a "short plain statement" of her claims.

[12] Andersen also advanced a state law false arrest theory against Popkov in Count V but conceded in her brief that it was time barred. Plaintiff's Response to Village and Popkov's Motion to Dismiss at 3.

her right to parent-child society (Count IV), to falsely arrest and detain her (Count VII), and to maliciously prosecute her (Count X). Andersen further contends that Gimbel defamed her (Count I) and Gimbel, Kharasch, and Popkov intentionally inflicted emotional distress upon her (Count II) by making derogatory remarks about her mental health, and that Gimbel also did so by refusing to drop the criminal charges against her (Count XI). Finally, as to the Village of Glenview, Andersen maintains that it bears responsibility for Popkov's various actions under a *Monell* theory of liability (Count XII).

For their part, the defendants attempt to counter this barrage on a count-by-count basis, asserting along the way that each different count should be dismissed. But because a "count" is not a claim per se, the invalidity of a count does not necessarily invalidate the claim; there may be more than one legal theory advanced in support of a single claim. And no matter how many legal theories, or "counts," a plaintiff may assert, they constitute a single "claim" to the extent premised on the same facts; "different legal theories . . . do not multiply the number of claims for relief." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir.1992) ("One set of facts producing one injury creates one claim for relief.").

The distinction between claims and theories matters because Rule 12(b)(6) "doesn't permit piecemeal dismissals of **parts** of claims." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original); *see also Hobbs v. Gerber*, No. 17 C 3534, 2018 WL 3861571, at *4 (N.D. Ill. Aug. 14, 2018) (Rule 12(b)(6) "does not speak of the dismissal of legal theories."); *Zidek v. Analgesic Healthcare, Inc.*, No. 13 C 7742, 2014 WL 2566527, at *2 (N.D. Ill. June 6, 2014) ("[I]f the Court were to grant partial relief on this Motion, it would not be 'dismissing claims' but rather limiting legal theories available to Plaintiffs to prove their entitlement to damages for these acts. The federal rules allow for dismissal for 'failure to state a claim' but do not provide a basis

for striking individual legal theories."). A complaint may be dismissed pursuant to Rule 12(b)(6) only if the claim, or claims, it asserts give rise to no entitlement to relief under any legal theory. *See Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012) (a claim survives if it is supported by at least one recognized legal theory). The upshot is that if there is some identifiable theory that plausibly supports a claim, that claim survives and there is no occasion for a court to "dismiss" alternative legal theories pursuant to Rule 12(b)(6).[13] *See, e.g., Julin v. Advanced Equities, Inc.*, No. 13 C 9075, 2015 WL 1810329, at *3 (N.D. Ill. Apr. 17, 2015) (no need for a district court to "waste its resources addressing each additional legal theory seeking the same recovery sought in earlier 'causes of action'").

To address the defendants' motion to dismiss the complaint, then, the Court must identify Andersen's "claims." As the Court reads the complaint, Andersen presents two. The first is premised on the allegations describing her arrest and detention; the second arises from her subsequent prosecution. To prevail on their motions to dismiss, the defendants must demonstrate that the facts relating to these two claims do not give rise to some right to legal relief against them. To do that, a defendant must show that there is no plausible legal theory to support liability on the factual claim; it is not sufficient to show that some, but not all, of the legal theories advanced fail to offer relief. In other words, if Andersen's claims can go forward against a defendant on some

---

[13] This is not to say that the viability of other legal theories has no relevance in other contexts. Ultimately, the plaintiff must identify and rely on specific legal theories, the sufficiency of which is tested on summary judgment and/or at trial. *See BBL*, 809 F.3d at 325 ("Summary judgment is different. The Federal Rules of Civil Procedure explicitly allow for '[p]artial [s]ummary [j]udgment' and require parties to 'identif[y] each claim or defense—or the part of each claim or defense—on which summary judgment is sought.'"). The viability of a particular theory may also affect the scope of discovery and may therefore be appropriately considered in that context.

legal theory, the defendant's motion to dismiss must be denied even if alternative theories advanced by the plaintiff do not support liability.

## I.  ANDERSEN'S ARREST AND DETENTION CLAIM

Andersen's central claim is that her arrest and detention violated a bevy of constitutional and state law rights. Although most of her theories are not viable, the Court concludes that, taken as true, the facts encompassed by this claim are sufficient to state a plausible claim for relief against Detective Popkov and Dr. Gimbel under the Fourth Amendment.

### A.  Constitutional Theories

In alleging constitutional violations, Andersen invokes 42 U.S.C. § 1983, which makes liable state actors for actions taken under color of law that violate the Constitution or other federal law. In Count VI, Andersen asserts against Detective Popkov theories of false arrest and unreasonable detention in violation of the First and Fourth Amendments, and deprivation of the right to counsel in violation of the Fifth and Sixth Amendments. In Count III, Andersen alleges that her detention by Popkov violated her substantive due process right to a parent-child relationship.

#### 1.  *Fourth Amendment: False Arrest*

Andersen's false arrest theory fails because Popkov had probable cause to arrest her for telephone harassment. To prevail on a false arrest action under § 1983, a plaintiff must show that officers violated the Fourth Amendment, as applied to the states through the Fourteenth Amendment, by arresting her without probable cause to do so. *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016) (citing *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012)). "A police officer has probable cause to arrest an individual when the facts and circumstances that are known to him reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 679 (7th Cir. 2007).

Further, probable cause that a person has committed *any* crime defeats a claim premised on false arrest, "even if the person was arrested on additional or different charges for which there was no probable cause." *Id.* at 682. Finally, the existence of probable cause is an objective evaluation; pretextual motives are irrelevant. *See Whren v. United States*, 517 U.S. 806, 806 (1996) ("Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis.").

Andersen first contends that raising the defense of probable cause is procedurally improper at the motion to dismiss stage and notes that the jury must decide whether probable cause exists where there is "room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013-14 (7th Cir. 2006). But that is not to say that the determination of probable cause is always, or even generally, the province of the jury. "Whether the known facts add up to probable cause is a legal question for the judge, not a subject on which jurors are entitled to form their own opinions." *Bridewell v. Eberle*, 730 F.3d 672, 676 (7th Cir. 2013). Courts, not juries, address the defense of probable cause when "the underlying facts claimed to support probable cause are not in dispute." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). And a plaintiff may plead herself out of court "by pleading facts that establish an impenetrable defense to [her] claims." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008).

Although the criminal complaint Popkov signed charged Andersen with stalking, he does not respond to Andersen's false arrest theory by arguing that there was probable cause to arrest her for that crime. Correctly noting that "so long as there is *a* reasonable basis for the arrest, the seizure is justified on that basis even if any other ground cited for the arrest was flawed," *Holmes*, 511 F.3d at 68, Popkov argues instead that the arrest was lawful because he had probable cause to believe that Andersen was guilty of telephone harassment. And he did.

Telephone harassment, as prohibited by the Illinois criminal code, is defined in relevant part as "[m]aking a telephone call, whether or not conversation ensues, with intent to abuse, threaten, or harass any person at the called number . . . ." 720 ILCS 5/26.5-2. In the eight voicemails Andersen left for Gimbel on August 2, 2015 in the span of about three hours, she calls Gimbel "a creep," "Hitler," "a complete jerk," and an "asshole." She tells him that he is "crazy" and "ridiculous," that "nobody likes [him]," and that he should "get over [himself]." She threatens to embroil his employer in the dispute. She asserts that he is in contempt of court. Put simply, the number, timing, and content of these calls reasonably support a belief that Andersen committed the crime of telephone harassment. *See* Village and Popkov's Memorandum in Support of Motion to Dismiss at Ex. 1.

Even without considering the voicemail recordings attached to defendants' motion to dismiss, moreover, this Court finds that Andersen's complaint establishes that "no reasonable jury could find that the officers did not have probable cause to arrest [her]" for telephone harassment. *Maxwell*, 998 F.2d at 434 (7th Cir. 1993). In *Reynolds v. Jamison*, the Seventh Circuit addressed a very similar set of facts and concluded that the officer had probable cause to arrest a suspect under the Illinois telephone harassment statute. 488 F.3d 756, 761 (7th Cir. 2007). In that case, the putative victim told police that the arrestee "had called her several times that day . . . and that he had made harassing phone calls to her at work over a period of months." *Reynolds*, 488 F.3d at 765. The Seventh Circuit, affirming the district court's grant of summary judgment in favor of the defendant, noted that "a complaint of the putative victim . . . is generally sufficient to establish probable cause unless the officer has a reason to question the witness' account." *Id.* The court also specified that the officer had not relied solely on the victim's statements; he also reviewed a call log and spoke to the victim's co-workers, who verified her account. Finally, the court dismissed

the arrestee's argument that he had also been harassed, explaining that whether the victim had also placed calls to the arrestee did not bear on whether the officer had probable cause at the time of the arrest. *Id.* at 762.

Here, Andersen alleges in her complaint that she "left several voicemails to demand access to her children." Compl. ¶ 29. The same day, she called Dr. Morris Kharasch, Gimbel's boss, to advise him of "Gimbel's inappropriate harassment." Kharasch later informed the Glenview Police Department of the call. *Id.* at ¶¶ 31, 53. Andersen further alleges that on another occasion, she "became angered and called several people to intervene and stop Gimbel from harassing her." *Id.* at ¶ 42. According to her complaint, Gimbel then "filed a police report . . . [stating] that he was being 'harassed' vis-à-vis the voicemail messages" and the officer "took the voicemails into evidence." *Id.* at ¶¶ 39, 44. Gimbel also forwarded a log of his incoming calls to Popkov. *Id.* at Ex. 18. Taken together, these facts clearly establish that Popkov had probable cause to arrest Andersen for telephone harassment. As in *Reynolds*, Gimbel filed a complaint with the police which was corroborated by a coworker, and Popkov relied on that information plus a call log provided by the putative victim. Andersen attempts to avoid this conclusion by arguing that Popkov purposefully ignored the fact that she too had filed police reports and that he should have therefore tried to secure exculpatory evidence. But again, as stated in *Reynolds*, "the fact that [the arrestee] originally called the police concerning the dispute . . . is immaterial," and once an officer has probable cause, he is "under no duty to investigate further." *Reynolds*, 488 F.3d at 762, 766; *see also Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006) ("Police need not conduct an investigation but may arrest and let prosecutors and courts determine who is telling the truth."). Popkov's alleged ulterior motive, moreover, is irrelevant under *Wren*. And finally, Andersen's claim that her acquittal on the harassment charge demonstrates that there was no probable cause for her arrest has no merit,

as probable cause is a lesser standard than proof beyond a reasonable doubt, which applied during her criminal trial. *See Harney v. City of Chicago*, 702 F.3d 916, 924 (7th Cir. 2012) (acquittal does not establish lack of probable cause). Because Andersen's allegations in the complaint establish that Popkov had probable cause to arrest her, her claim cannot prevail on a Fourth Amendment false arrest theory.[14]

### 2. Fourth Amendment: Unreasonable Detention

Andersen also contends in Count VI that her overnight detention violated the Fourth Amendment. In *Gerstein v. Pugh*, the Supreme Court held that an on-the-scene probable cause assessment permits police officers to detain suspects for a brief period while they take "administrative steps incident to arrest." 420 U.S. 103, 113-14 (1975). The Fourth Amendment, however, entitles a person arrested without a warrant to a prompt judicial determination of probable cause. *Id.* Detention for up to 48 hours will generally comply with the Fourth Amendment unless "the arrested individual can prove that his or her probable cause determination was delayed unreasonably." *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). A delay is unreasonable when, for example, it is needless, it is motivated by ill will against the arrested individual, it is extended to gather additional evidence to justify the arrest, or it is deliberately

---

[14] Andersen also makes a cursory allegation that Popkov violated the First Amendment by arresting her in retaliation for her demands that "the cronyism between the Glenview Police Department and [Gimbel] cease." Compl. at ¶ 222. While neither the defendants nor Andersen explicitly address this allegation in their briefs, the defendants appear to argue that Andersen's false arrest retaliation theory should be barred by qualified immunity. This Court agrees. Qualified immunity shields a police officer from civil damages unless the officer violated a constitutional right that was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). As the Seventh Circuit held in *Thayer v. Chiczewski*, "neither our circuit nor the Supreme Court has recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause." 705 F.3d 237, 253 (7th Cir. 2012) (citations omitted). Accordingly, to the extent that Andersen asserts that her claim can proceed on a First Amendment retaliation theory, that theory also fails as a matter of law.

created so that the process becomes the punishment. *Id.* at 56; *Portis v. City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010). On the other hand, courts "cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities." *McLaughlin*, 500 U.S. at 56-7.

Andersen was allegedly detained for approximately 24 hours before she was brought before a judge. She argues that the detention was unreasonable because its purpose was to deprive her of custody of her children so that Gimbel could take them to a football game. *See Portis*, 613 F.3d at 705 (explaining that courts must examine "not only the length of a given detention but also the reasons why release was deferred"). Popkov does not defend the delay as necessary to complete the administrative processing required by his arrest of Andersen. Effectively conceding that there was no administrative justification to hold Andersen overnight, Popkov defends the reasonableness of the overnight detention by asserting that the Illinois Domestic Violence Act ("IDVA"), 750 ILCS 60 § 304(a)(1) required it. That Act states in relevant part that "whenever a law enforcement officer has reason to believe that a person has been abused, neglected, or exploited by a family or household member, the officer shall immediately use all reasonable means to prevent further abuse, neglect, or exploitation, including: arresting the abusing, neglecting and exploiting party, where appropriate." 750 ILCS 60 §304(a)(1).[15]

The Court concludes that the facts alleged plausibly show that detaining Andersen in custody overnight was unreasonable because her detention was engineered to give custody of the

---

[15] The Village also argues that "any claim based on Plaintiff's detention should accrue, at the very latest, when the detention ends" and is therefore time barred. Village and Popkov's Reply Brief 17, ECF No. 62. The Court rejects this argument out of hand. Contrary to the Village's

children to Gimbel on September 11, not to protect Gimbel, or the children, or others, from Andersen. For example, she alleges—and email evidence corroborates the claim—that Popkov was communicating with Gimbel about the arrest at least two days before it occurred and knew about both Gimbel's desire to take his children to the football game on September 11 and Andersen's refusal to acquiesce in that plan. That Popkov waited to arrest Andersen until the afternoon of the day before Gimbel wanted the children also plausibly supports Andersen's allegation that Popkov was cooperating with Gimbel's alleged plan, as does the delay in processing Andersen until 7 p.m. that evening. Both actions ensured that Andersen could not interfere with Gimbel's alleged plan to take custody of the children on September 11 notwithstanding Andersen's objections. The complaint alleges, moreover, that Popkov had decided before school was out (*i.e.,* by midafternoon at the latest) that Andersen would be detained overnight, further confirming that administrative considerations did not animate that decision. Compl. ¶ 71. Andersen also alleges that Popkov engaged in stalling tactics, "wasted time," mocked her while she was in custody, and responded with a "twisted form of amusement" when she asked to call an attorney. *Id*. at ¶¶ 74, 229. Further, she alleges that Popkov was smiling and socializing with Gimbel the next day at the bond hearing. There may, of course, be many other facts that bear on the reasonableness of detaining Andersen overnight, but taking these facts as true, the complaint plausibly alleges that Popkov needlessly extended Andersen's detention to assist Gimbel's alleged ploy.

Popkov's reliance on the IDVA does not render Andersen's theory implausible. Contrary to Popkov's assertion that "[t]he DVA required Det. Popkov to effectuate a custodial arrest of Plaintiff," Village and Popkov's Memorandum in Support of Motion to Dismiss at 17, there does

---

assertion, Andersen filed her complaint in July 2017, within 2 years of when she was released from custody in September 2015, as required by the statute of limitations for § 1983 actions in Illinois.

not appear to be anything in the IDVA requiring an officer to detain an offender overnight. While the statute contemplates that an arrest may be appropriate to protect a victim of domestic violence, it imposes no such requirement, much less a requirement to continue overnight the detention attendant to an arrest. Further, the predicate for keeping Andersen in custody overnight to prevent "further" abuse, neglect, or exploitation is exceedingly weak on the present record and does not establish, as a matter of law, that Popkov's actions were not motivated by animus and ill will—which is what Popkov would have to show to defeat Andersen's unlawful detention theory. Popkov arrested Andersen on charges based on a series of telephone calls that Andersen had made, many of them more than a month earlier; and the evidence supports a reasonable inference that there were no exigent circumstances that required Andersen's overnight detention to resolve. Nor, one may plausibly infer, was there a need to hold Andersen (who Popkov knew to be a licensed attorney) to ensure her appearance in court. A Rule 12(b)(6) motion requires the Court to take the facts alleged by the plaintiff as true, and Andersen's allegations plausibly support her theory and directly contradict the Village's purported justification under the IDVA.[16] As such, this fact dependent theory cannot be rejected at this juncture.

### 3.    *Fifth and Sixth Amendments: Right to Counsel*

Set forth in Count VI but absent from the briefs of both parties are Andersen's allegations that Popkov violated her Fifth and Sixth Amendment rights by refusing to provide access to counsel while she was in police custody. Compl. ¶ 221. Neither theory is viable here. The Sixth Amendment does not attach until the initiation of adversarial criminal proceedings. *Kirby v.*

---

[16] Popkov does not make a qualified immunity argument in connection with Andersen's overnight detention (as opposed to the loss of familial relations theory), so it is waived. The Court is also unwilling to apply the doctrine of qualified immunity at this stage because it is clearly established (*see County of Riverside, supra*) that arrestees may not be detained for improper purposes.

*Illinois*, 406 U.S. 682, 689 (1972). After attachment, defendants have a right to counsel only during "critical stages," *i.e.* "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade*, 388 U.S. 218, 226 (1967). A custodial interrogation conducted before charging does not violate a defendant's Sixth Amendment right to counsel. *Moran v. Burbine*, 475 U.S. 412, 431-32 (1986); *Watson v. Hulick*, 481 F.3d 537, 542 (7th Cir. 2007) ("[I]nterrogation of a suspect before the filing of a charge, without more, does not trigger the right to counsel."). Further, even if the right had attached at some point after the interrogation, being held in custody is not, in and of itself, a critical stage of a prosecution.

Andersen's Fifth Amendment theory also fails, because she concedes that she waived her *Miranda* rights. Compl. ¶ 68. That she did not know she would be questioned about potential felony charges is of no moment. *See Colorado v. Spring*, 479 U.S. 564, 573, (1987) (rejecting claim that waiver was invalid when officers did not inform suspect that they would question him about a murder, as opposed to a firearm offense as he had assumed). And while a suspect may invoke her *Miranda* rights after an initial waiver, an invocation of *Miranda*'s right to counsel requires only that the interrogation cease until an attorney is present—not that counsel be summoned. *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). Further, Andersen's theory would fail even if Popkov *had* continued to question her, because a failure to provide *Miranda* warnings does not itself give rise to liability under § 1983 if none of the ensuing statements are introduced at trial. *See Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (no Fifth Amendment violation where statements made in violation of *Miranda* are not admitted as testimony against defendant in a criminal case); *Hanson v. Dane Cty., Wis.*, 608 F.3d 335, 339 (7th Cir. 2010) ("We know from *Chavez v. Martinez* . . . that interrogation that yields incriminatory evidence never used in court

does not support an award of damages."); *Sornberger v. Knoxville*, 434 F.3d 1006, 1024–25 (7th Cir. 2006) ("After *Chavez* . . . violation of the *Miranda* safeguards cannot provide the basis for § 1983 liability without use of a suspect's statements against him in a 'criminal case.'").

For these reasons, Andersen cannot plausibly assert that her arrest and detention by Popkov violated her constitutional rights to counsel.

### 4.      *Fourth or Fourteenth Amendments: Familial Relations*

In Count III, Andersen asserts that her detention violated her constitutional right to familial relations (or in her terms, parent-child society). As Andersen points out, the Due Process Clause of the Fourteenth Amendment "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). Where, however, a particular Amendment "provides an explicit textual source of constitutional protection . . . that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing [the] claims." *Graham v. Connor*, 490 U.S. 386, 395 (U.S. 1989). Andersen's due process loss of custody theory overlaps with her Fourth Amendment theory, at least to the extent that it stems from her arrest and overnight detention. *See Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1017 (7th Cir. 2000) (child's theory of interference with familial relations was properly analyzed under the Fourth Amendment rather than as a deprivation of substantive due process to the extent it was premised on his physical removal from his home, because the Fourth Amendment "specifically addresses that seizure"). And as the Court has concluded above that Andersen has a viable claim arising from her overnight detention, it follows

that she has also plausibly alleged that her forced overnight separation from her children violated her Fourth Amendment rights.

Andersen lost custody of her children not just overnight, however, but for 30 days. She maintains that Popkov is responsible for that injury because he made false statements about her mental health, which resulted in the bond court removing the children from her custody pending completion of a mental evaluation and further order of the family court—a period that did not end until the judge presiding over the divorce case restored Andersen's custody rights 30 days later. Popkov argues that this aspect of Andersen's theory is also governed by the Fourth Amendment, not the Fourteenth, but the Seventh Circuit has long held that the forced separation of parents and children implicates substantive due process.[17] *Brokaw,* 235 F. 3d at 1018; *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011) ("The fundamental right to familial relations is an aspect of substantive due process.").

---

[17] It is not completely clear which Amendment provides the proper avenue for challenging bond conditions which interfere with familial relationships. In *Brokaw*, the Seventh Circuit addressed post-seizure forced separation under the due process clause, noting authority holding that the Fourth Amendment ceases to apply after a probable cause hearing. *Id.* at 1018 n.14. The Supreme Court, however, expressly rejected that reasoning in *Manuel v. City of Joliet*, 137 S. Ct. 911, 917-8 (2017), where it held that the Fourth Amendment is the appropriate framework for assessing pretrial deprivations of liberty, even where the alleged deprivation occurs after the legal process commences. But both *Brokaw* and *Manuel* involved claims by individuals who themselves were physically seized; as far as this Court can tell, neither the Supreme Court nor the Seventh Circuit has addressed whether a criminal defendant has Fourth Amendment standing to challenge a condition of pretrial release which orders a child to be removed from their custody. In other words, it is not clear that the bond condition in question constitutes a "seizure." On one hand, the Seventh Circuit has stated that "interference with the parental right to 'care, custody, and control' ordinarily is measured through the objective lens of the Fourth Amendment. *Terry v. Richardson*, 346 F.3d 781, 785 (7th Cir. 2003). On the other hand, it has also cited with approval the First Circuit's holding that "run-of-the-mill conditions of pretrial release . . . do not constitute Fourth Amendment seizure." *Alexander v. McKinney*, 692 F.3d 553, 557 n.2 (7th Cir. 2012) (quoting *Harrington v. City of Nashua*, 610 F.3d 24, 32-3 (1st Cir. 2010). Because the choice of applicable provision does not change the outcome of the Court's analysis, it is not necessary here to attempt to resolve this question.

The analysis, however, is essentially the same under either Amendment. *See Brokaw*, 235 at 1019 (noting the balance of individual's interest in familial relationship against state's interest in protecting children is the same under the Fourth and Fourteenth Amendments). *See also Wallis v. Spencer*, 202 F.3d 1126, 1137 (9th Cir. 2000) ("[T]he same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children . . . ."). Specifically, "a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019. Perhaps more importantly, procedural due process requires that "government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Id.* at 1020.[18]

The problem with Andersen's argument, however, is that the complaint fails to allege facts that give rise to a plausible inference that Popkov bears responsibility for the court's entry of an order granting temporary custody of the children to Gimbel. The complaint alleges only that the State's Attorney requested the mental health evaluation and temporary loss of custody; as for Popkov's involvement, it states only, on information and belief, that the State's Attorney was acting on derogatory information she obtained from Popkov, Gimbel, and Kharasch. Compl. ¶ 91. In making that claim, Andersen is effectively asserting that Popkov made false statements to the

---

[18] Popkov argues that Andersen's pretrial release conditions theory is barred by his probable cause to arrest her. That argument fails. Probable cause to arrest does not necessarily equate to probable cause to deprive a parent of custody of their children; to the extent that courts analyze probable cause in the context of custody determinations, they look to whether the state actor had probable cause to believe that the children faced an immediate threat of abuse, not to whether the defendant committed some crime. *Siliven v. Indiana Dep't of Child Servs.*, 635 F.3d 921, 927 (7th Cir. 2011). And for reasons already discussed, *supra* at 19-21, the Court is unpersuaded by the Village's argument that the Illinois Domestic Violence Act required Popkov to protect Andersen's victims. While it does require courts to enter no contact orders with the victim, none of the parties have suggested that the children were victims of Andersen's telephone harassment.

State's Attorney—that's an allegation of fraud, but Andersen fails to provide the detail required by Rule 9(b). *U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016) (allegations based on "information and belief" are insufficient to satisfy Rule 9(b)'s particularity requirement). Andersen entirely fails to describe the allegedly false information that Popkov told the State's Attorney, so there is no basis from which it can plausibly be inferred that the State's Attorney's request to the court regarding custody of the children was the product of false information Popkov provided.

The Seventh Circuit has also held, however, that "[t]he general rule that fraud cannot be pled based on information and belief is not ironclad . . . the practice is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides "the grounds for his suspicions." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co*, 631 F.3d 436, 443 (7th Cir. 2011). Andersen was not privy to communications between Popkov and the State's Attorney, of course, and it is fair to say that she has grounds to suspect that Popkov—who she has plausibly alleged conspired with Gimbel to take her into custody—provided derogatory information to the prosecutor about her mental health. But even if Andersen's conclusory allegations in this regard are credited, another obstacle remains: there is no basis to infer that information provided by Popkov influenced the judge's decision to impose a bond condition prohibiting Andersen from having contact with her children. In requesting that condition, the Assistant State's Attorney told the judge that "we are asking that the no contact actually includes the children as well. We are concerned for their safety as well, given the defendant's mental state." Compl. Ex. 23 at 29:8-11. When Andersen's attorney protested that "there's no factual basis to form an opinion such as that. There's no allegation she ever harmed these children," *id.*, the State's Attorney pointed to Andersen's demeanor in court as warranting

the request, not to any information that the arresting officers or Gimbel had provided. *Id.*; *see also* Compl. ¶ 90 ("the State's Attorney pointed to Plaintiff's demeanor to suggest that she was mentally unwell"). It is not as if the prosecutor told the judge that the investigating officer, who had interviewed Andersen at length, believed she was mentally ill; had that been the case, Andersen might have a plausible basis to pin her loss of custody on Popkov. But that is not what happened. Simply put, the judge heard nothing about Popkov's view of Andersen's mental health, so that opinion could not have prompted the judge to put the children in Gimbel's custody. The complaint therefore does not support liability against Popkov for depriving Andersen of access to her children other than for the period she was detained.

### B. State Law: Defamation

In Count I, Andersen similarly alleges that Gimbel defamed her by making false and derogatory comments about her mental health "at the time of her arrest" in September 2015. Compl. ¶ 172. Her defamation theory, however, is untimely. In Illinois, the statute of limitations for a claim premised on defamation is one year. 735 ILCS 5/13-201. Andersen did not file this case until July 14, 2017, almost two years after her arrest.[19] In her response to Gimbel's motion to dismiss, Andersen argues that she "clearly states" that Gimbel continued defaming her well after she was arrested. The Court cannot agree. The last instance of alleged defamation referenced in the complaint occurred in November 2015, more than a year before she filed suit, when Gimbel made comments about Andersen's mental health to "unnecessary third parties." Compl. ¶ 113.[20] And while Andersen argues in her brief that Gimbel made false statements during his continuing request

---

[19] Andersen is correct that timeliness is typically an affirmative defense not addressed on a 12(b)(6) motion. However, as addressed above, where the complaint itself establishes the defense, it is not improper for a court to dismiss it on those grounds.

[20] Andersen incorporates into her complaint an e-mail from Gimbel which she says was sent after the alleged defamation. The e-mail is dated November 5, 2015. Compl. Ex. 33.

for sole custody, she does not allege those facts in the complaint. Finally, absent any other facts, it would be unreasonable to infer from Andersen's success in keeping witnesses from testifying about her mental health at trial that Gimbel was continuing to make defamatory statements at that time. As alleged in the complaint, Andersen's defamation theory is time-barred.

## II. ANDERSEN'S IMPROPER PROSECUTION CLAIM

Andersen also asserts a claim arising from the facts relating to her prosecution on charges of stalking and harassing Gimbel. While there is some overlap in the facts relating to Andersen's arrest and detention and her subsequent prosecution—specifically, the prosecution was initiated by the filing of a criminal complaint against Andersen before she was released on bond—the course of the prosecution is thereafter a distinct story and is alleged to have caused legal wrongs that are distinct from the injuries Andersen alleges as the result of her arrest and detention.

### A. Fourth or Fourteenth Amendment: "Federal" Malicious Prosecution

Count IX alleges that Popkov maliciously prosecuted Andersen in violation of either the Fourth or Fourteenth Amendment. The Court must reject both theories because, as the Seventh Circuit has repeatedly explained, "there is no free-standing constitutional tort of malicious prosecution, though there are other constitutional rights . . . that protect people against abusive arrests, fabrication of evidence, etc." *Hurt v. Wise*, 880 F.3d 831, 843 (7th Cir. 2018), *cert. denied*, (U.S. Oct. 29, 2018) (citing *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001)). To the extent that Andersen complained of such practices, they should and have been addressed in the context of the specific constitutional rights that they implicate; a plaintiff "must allege something else that does amount to a constitutional violation (even if [she] calls it malicious prosecution)." *Serino v. Hensley*, 735 F.3d 588, 593 (7th Cir. 2013). And to the extent that Andersen is claiming that her prosecution itself violated either the Fourth or Fourteenth Amendment, her argument fails. "[T]here is no such thing as a constitutional right not to be prosecuted without probable cause,"

*id.*, so the Fourth Amendment is not implicated.[21] Nor can Andersen ground in the Fourteenth Amendment an assertion that Popkov unconstitutionally fabricated evidence because "an act of evidence fabrication doesn't implicate due-process rights unless the fabricated evidence is later used to deprive the criminal defendant of her liberty in some way." *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (citations omitted). Here, Andersen alleges that Popkov lied at the grand jury hearing[22] and at trial and fabricated a police report stating that Andersen had breached the peace at a Starbucks in June 2016. But Andersen concedes that she was released on bond and eventually acquitted. She does not state in her complaint that any of these alleged fabrications caused a deprivation of liberty. *See Saunders–El v. Rohde*, 778 F.3d 556 (7th Cir. 2015) (no viable evidence fabrication claim where defendant was released on bond following arrest and acquitted at trial). A federal malicious prosecution or fabrication of evidence theory therefore fails on these facts.

---

[21] The prosecution must be distinguished from Andersen's overnight detention, which (as has been discussed above) is actionable under the Fourth Amendment. In that regard, "the wrong is the detention rather than the existence of criminal charges." *Manuel v. City of Joliet, Illinois*, 903 F.3d 667, 670 (7th Cir. 2018).

[22] Providing false testimony would not give rise to a due process claim for two additional reasons. First, "[t]he Constitution does not require that police testify *truthfully*; rather the constitutional rule is that the defendant is entitled to a trial that will enable jurors to determine where the truth lies." *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015) (emphasis in original; internal quotation marks omitted). Second, witnesses are immune from civil liability. *Canen v. Chapman*, 847 F.3d 407, 415 (7th Cir. 2017) ("witnesses enjoy absolute immunity . . . and we have acknowledged that this protection covers the preparation of testimony as well as its actual delivery in court"); *Curtis v. Bembenek,* 48 F.3d 281, 283-85 (7th Cir. 1995) (police officers have absolutely immune from liability for false testimony at preliminary hearings where probable cause is assessed); *Kincaid v. Eberle*, 712 F.2d 1023, 1023 (7th Cir. 1983) (*per curiam*) (grand jury witnesses enjoy same immunity from civil liability as do trial witnesses).

### B.    State Law: Malicious Prosecution

Although there is no federal theory of malicious prosecution, Illinois does recognize such a tort. To establish liability for malicious prosecution under Illinois law, a plaintiff must allege facts showing 1) the commencement or continuance of an original criminal proceeding by the defendant; 2) the termination of the proceeding in favor of the plaintiff; 3) the absence of probable cause for such proceeding; 4) the presence of malice, and 5) damages resulting to the plaintiff. *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016). Because the Court has already found that probable cause existed for the misdemeanor telephone harassment charge for which Andersen was eventually tried, that charge cannot support a malicious prosecution theory of liability. Andersen also alleges, however, that Popkov maliciously prosecuted her for two counts of felony stalking and one count of felony telephone harassment with intent to kill.

Popkov argues that Andersen's malicious prosecution theory must fail because all of the felony charges were also supported by probable cause. He is correct. The (now defunct) felony stalking statute prohibited "engag[ing] in a course of conduct directed at a specific person [when an individual] knows or should know that this course of conduct would cause a reasonable person to: 1) fear for his or her safety or the safety of a third person; or 2) suffer other emotional distress." 720 ILCS 5/12-7.3(a)(2). Violations of the telephone harassment statute constitute felonies rather than misdemeanors if "in the course of the offense, [the offender] threatened to kill the victim." 720 ILCS 5/26.5-5(b)(4). Because Popkov does not contend that Andersen failed to adequately allege the other elements of a malicious prosecution claim,[23] the issue is whether those charges were supported by probable cause.

---

[23] The Court notes that the proceedings were terminated in Andersen's favor. The State nolle prossed the two felony charges on July 18, 2016 in light of a June 2016 Illinois Appellate Court ruling striking down the stalking statute as unconstitutional. *See People v. Relerford*, 56 N.E.3d 489 (Ill. App. Ct. 2016) (holding that the statutes violated substantive due process because

That question can be answered easily. A grand jury indictment conclusively establishes the existence of probable cause as to the charged crimes. *See Kaley v. United States*, 571 U.S. 320, 328 (2014); *United States v. Schreiber*, 866 F.3d 776, 781 (7th Cir. 2017). In *Colbert v. City of Chicago*, 851 F.3d 649, 655 (7th Cir. 2017) (applying Illinois law), the Seventh Circuit affirmed the denial of a malicious prosecution claim against a police officer, explaining:

> The fact that [the plaintiff] was indicted by a grand jury defeats his [malicious prosecution] claim. Noting that "a malicious prosecution action against police officers" can often be "anomalous," we have explained, [T]he State's Attorney, not the police, prosecutes a criminal action. It is conceivable that a wrongful arrest could be the first step towards a malicious prosecution. However, *the chain of causation is broken by an indictment*, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements by the officers to the prosecutor. *Reed v. City of Chi.*, 77 F.3d 1049, 1053 (7th Cir. 1996) (emphasis added). Thus, a plaintiff may not maintain a malicious-prosecution claim against an arresting officer without first showing "some postarrest action which influenced the prosecutor's decision to indict." *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 902 (7th Cir. 2001).

Andersen argues that Popkov's post-arrest misconduct is "unquestionably relevant to rebut the presumption of probable cause raised by the grand jury indictment," Plaintiff's Response to Village and Popkov's Motion to Dismiss 11-12, ECF No. 45, but she fails to explain how that alleged misconduct influenced the prosecutor's decision to indict. *Colbert v. City of Chicago*, 851 F.3d at 655 (noting the plaintiff's failure to show that officer's alleged post-arrest false statement

---

they permitted conviction based on negligence); *see also People v. Relerford*, 2017 121094, 104 N.E.3d 341 (rejecting the appellate court's holding but affirming on the basis that the statute violated the First Amendment right to free speech). Illinois law provides that "a nolle prosequi dismissal terminates a proceeding in favor of the accused unless the abandonment is for reasons not indicative of the innocence of the accused." *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001). Given that it would be impossible for Andersen to be found guilty under an unconstitutional statute, the nolle prosequi was indicative of her innocence. The state also reduced the felony telephone harassment with intent to kill charge to a misdemeanor, allegedly to avoid Andersen's motion to dismiss. That allegation, taken as true, makes it at least plausible that the state knew that Andersen did not have an intent to kill and therefore adequately establishes termination in her favor.

influenced prosecutor's actions). She points instead to Popkov's alleged failure to preserve or produce exculpatory evidence, but that does not vitiate the legitimacy of the grand jury's indictment because there is no requirement to present such evidence to a grand jury in the first place. *See*, *e.g.*, *United States v. Williams*, 504 U.S. 36, 51 (1992) ("requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body"); *People v. Beu*, 268 Ill. App. 3d 93, 97–98, 644 N.E.2d 27, 30 (1994) ("the prosecutor has no duty to present exculpatory evidence to the grand jury").

Similarly, to the extent that Andersen alleges that Popkov testified falsely before the grand jury, false testimony before the grand jury cannot support a claim of malicious prosecution because grand jury witnesses enjoy absolute immunity with respect to their testimony. *See Rehberg v. Paulk*, 566 U.S. 356, 369 (2012) ("a grand jury witness [including a law enforcement officer] has absolute immunity from any § 1983 claim based on the witness' testimony."); *Barnes v. Martin*, 2014 IL App (2d) 140095-U ¶ 57 (citing *Rehberg* and holding that police officer was absolutely immune under state law from liability on any claim to the extent it was predicated upon the officer's grand jury testimony).

The Court is constrained to note as well that Andersen's allegations about Detective Popkov's grand jury testimony are demonstrably inaccurate (and therefore need not be credited). She maintains, for example, that Popkov lied to the grand jury by testifying that Andersen had threatened Gimbel in her voicemail messages. Plaintiff's Response to Village and Popkov's Motion to Dismiss at 23. In fact, Popkov testified that Andersen had left messages "of a threatening nature" on August 2, 2015, and had subsequently called four separate departments at the hospital where Gimbel was employed in an attempt to speak with Gimbel's supervisor and had left multiple

messages on the supervisor's phone demanding that Gimbel be fired and threatening to sue the supervisor and the hospital. And review of the recordings of Andersen's August 2 messages reflect that she did, in fact, threaten to call Gimbel's supervisor to complain of Gimbel's harassment. Popkov's testimony on this point was not misleading or inaccurate.

As a second example, Andersen's argument that Popkov testified in the grand jury hearing that she threatened to kill Gimbel is simply wrong. Popkov testified that Andersen left a voicemail message for Gimbel in which she stated, "You're dead. You're dead." Review of the September 6 voicemail messages left by Andersen confirms Popkov's account and that he did not further characterize Andersen's statement, contrary to her argument.

A third example of Andersen's inaccurate characterizations of Popkov's statements is too egregious to let pass without comment. Throughout her briefs, Andersen argues that Popkov pursued stalking charges against her even though he did not believe that she was guilty of stalking. Putting aside that Popkov's subjective belief about Andersen's guilt is irrelevant, Andersen's argument is premised on a characterization of an email (Compl. Ex. 18) in which Popkov advised Gimbel that evidence Andersen frequently showed up early to pick up the kids on days when she was to have custody "most likely won't constitute stalking." But the stalking complaint that Popkov signed, and his testimony in the grand jury, was not premised on showing up early to pick up the children; rather, it was based almost entirely on Andersen's telephone calls and voicemail messages. The notion that Popkov "purposefully misled the grand jury . . . when he failed to disclose to them that he did not believe that there was sufficient evidence to support a stalking charge as shown in Complaint Exhibit 18," Compl. ¶ 96, is baseless.

At bottom, the premise of Andersen's malicious prosecution argument is that the grand jury is an adjudicatory body that should have all available information available to it in assessing

whether there is probable cause to indict. But that is simply incorrect. Contrary to Andersen's assertion, "grand jury proceedings are not intended to approximate a trial on the merits." *People v. Fassler*, 153 Ill. 2d 49, 59–60, 605 N.E.2d 576, 581 (1992). "It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." *Williams*, 504 U.S. at 51. And "[b]ecause a grand jury does not determine guilt or innocence, it may pursue its investigation unrestrained by the technical evidentiary and procedural restrictions that govern criminal trials." *Fassler,* 153 Ill. 2d at 60, 605 N.E.2d at 581. That Andersen was charged by a grand jury that did not have information that she believes to have been exculpatory simply does not make the police officer who provided the incomplete information liable for malicious prosecution.

## III.   THEORIES THAT SPAN ANDERSEN'S CLAIMS

Andersen also advances several theories of liability for conduct that spans both her false arrest/unlawful detention claim and her malicious prosecution claim. To minimize redundancy, the Court will address those theories together here.

### A.   *Monell* Liability

Andersen's claims against the Village of Glenview as described in Count XII fail. Under *Monell v. New York City Dept. of Social Services*, local governments may not be sued under § 1983 unless one of its policies caused the alleged constitutional violation. 436 U.S. 658, 694 (1978). A "policy" may exist in the form of either 1) an express policy that causes a constitutional deprivation; 2) a widespread practice that, while not officially authorized, is "so permanent and well settled as to constitute a custom or usage with the force of law"; or 3) an act of a person with "final policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

Andersen argues that she states a plausible claim against the Village because she alleged that it had an unofficial custom or practice of 1) allowing officers to lie under oath and tamper

with evidence (*i.e.*, allowing the fabrication of evidence), and 2) obstructing the production of exculpatory evidence. As an initial matter, the allegations in the complaint fall well short of plausibly supporting the existence of such policies. While Andersen alleges that there was another "scandal" involving false statements by a Glenview police officers, pointing to a single other comparable incident is generally regarded as insufficient to establish the existence of a municipal policy.[24] *See Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995) (explaining that in the absence of direct evidence, "a single act of misconduct" does not support an inference that an unconstitutional policy exists); *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (dismissal of *Monell* claim affirmed where plaintiff failed to plausibly allege that unconstitutional practice was widespread). It would be particularly inappropriate to make the leap of faith necessary to justify such an inference here, where the complaint goes on to allege that, far from ignoring the transgression, the Village disciplined the officer by firing him. Compl. ¶ 269. That scenario does not begin to support Andersen's allegations that the Village has adopted unsavory policies and practices like encouraging its police officers to commit perjury and fabricating evidence against criminal defendants.

Beyond that problem, Andersen cannot state a claim for relief premised on a *Monell* theory because "there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of a plaintiff's constitutional rights." *Petty v. City of Chicago*, 754 F.3d 416, 424-25 (7th Cir. 2014) (citations omitted). Andersen cannot establish that the policies she

---

[24] In *White v. City of Chicago*, 829 F. 3d 837, 844 (7th Cir. 2016), the court found that the plaintiff adequately alleged a widespread practice even though he had not identified "every other or even one other individual" who had been subjected to the complained-of process. But, in addition to his allegations, the plaintiff also provided direct evidence in the form of a written document that illustrated the practice. It is therefore not inconsistent with *White* to conclude that bare allegations of a widespread policy (without more) are insufficient to survive a 12(b)(6) motion to dismiss.

identifies (fabricating evidence and failing to produce exculpatory evidence) violated her due process rights because, as addressed above, Andersen concedes that she was released on bond and acquitted at trial. *See Saunders–El*, 778 F.3d at 561; *Bianchi*, 818 F.3d at 320 ("A [failure to produce exculpatory evidence] requires a showing of prejudice, which can't be made here because the plaintiffs were acquitted.").

Andersen also appears to argue that, under the third *Monell* theory of municipal of liability, persons with final policymaking authority took actions which violated her constitutional rights. Specifically, Andersen alleges that Eric Patt, attorney for the Village of Glenview, withheld exculpatory information and "was deliberately indifferent" to Andersen's demands for competent investigation of the charges. But Andersen has not adequately alleged that Patt has "final policymaking authority" for *Monell* purposes. Indeed, she states only that Patt "sits as a regular participant at the Village Board meetings" and "is consulted" by the Village of Glenview. Compl. ¶¶ 271, 272. As the Seventh Circuit explained in *Smith v. Flaxman*, a city attorney's authority to represent the city and its employees in litigation "does not extend to an authority to create municipal policy." 962 F.2d 11 (7th Cir. 1992).

Finally, Andersen argues that the Village of Glenview attempted to "cover up" Popkov's wrongdoings by 1) fabricating an arrest report in anticipation of civil litigation and 2) hiring a law firm that specializes in false arrest/malicious prosecution claims before Andersen's criminal prosecution was completed. Although not addressed in the briefs, a single instance of a cover up directly engineered by a municipality may be actionable. *Jackson*, 66 F.3d at 152. The facts alleged in the complaint, however, do not support this theory of liability. First, Andersen does not explain how filing a fake arrest report regarding a breach of peace at a Starbucks constitutes any sort of "cover up," nor does she allege any facts connecting a Glenview decisionmaker with "final

authority to establish municipal policy" to the report; indeed, she states only that Popkov and two other officers on the scene manufactured the report. Compl. ¶ 146. Second, even if the law firm was hired by a final decisionmaker (which Andersen does not allege), it would be more indicative of responsible preparation for civil litigation (which Andersen made clear was forthcoming) than of wrongdoing; as explained in the Court's ruling denying Andersen's motion to disqualify the attorneys hired, that the Village hired lawyers to assist with its participation in the criminal case and to represent it in the civil case is not at all probative of an effort to "cover up" Popkov's alleged misconduct. The Court need not draw unreasonable inferences. Andersen's conclusory allegation of a "cover up" therefore need not be accepted, and this aspect of her claim is rejected. Accordingly, Andersen's claims against the Village are dismissed.[25]

B. **Conspiracy Liability**

Andersen alleges that Popkov and Gimbel conspired to falsely arrest and detain her overnight (Count VII), deprive her of her right to a parent-child relationship (Count IV), and maliciously prosecute her (Count X). It is somewhat unclear whether Andersen's conspiracy liability theory is premised on federal or state law, but in either case, Andersen must establish the underlying violation. *See Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, 187 F.3d 743, 754 (7th Cir. 1999) ("[T]he absence of any underlying violation of the plaintiffs' rights precludes the possibility of their succeeding on [a federal] conspiracy count."); *Weber v. Cueto*, 624 N.E.2d 442, 449 (Ill. App. Ct. 1993) ("[C]onspiracy, standing alone, is not a separate and distinct tort in Illinois."). Andersen's theories that Gimbel and Popkov conspired to falsely arrest her and to maliciously prosecute her therefore fail on these facts because, as explained above, Andersen has

---

[25] In light of the Village's dismissal from this case, its motion to bifurcate and stay *Monell* discovery, ECF No. 112, is denied as moot.

not established the underlying violations. As for the aspects of Count IV and Count VII alleging conspiracy to unreasonably detain Andersen overnight and deprive her of custody of her children for that time (the only remaining theory), the Court infers from her reliance on *Gardunio*, 674 F. Supp. 2d at 986, 985-986, that she intends to assert that theory under § 1983.[26]

To hold a private individual liable under § 1983, Andersen must establish that 1) a state official and private individual reached an understanding to deprive plaintiff of her constitutional rights, and 2) the private individual was a willful participant in joint activity with the State or its agents. *Logan v. Wilkins*, 644 F.3d 577, 583 (7th Cir.2011). Conspiracies may be demonstrated with circumstantial evidence, but mere conjecture is insufficient to state a claim. *Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015).

The only argument advanced by the defendants in support of their challenges to Andersen's conspiracy theory is that the complaint fails to adequately allege that Popkov and Gimbel "reached an understanding" or had an agreement to unreasonably detain her. With respect to Andersen's contention that she was detained overnight unlawfully, the Court concludes—for the reasons set forth above—that she has. Most significantly, Gimbel told Popkov that "[it's] going to be interesting on Friday if barb is not arrested," plausibly implying that they planned the timing of Andersen's arrest and detention together. Compl. Ex. 20. Further, Popkov allegedly knew that Gimbel wanted greater custody rights. And, by alleging that Gimbel bragged about using his connections with the Police Department to harass her, Andersen also adequately established that he was a willful participant. These facts suffice to permit a plausible inference that Gimbel was in league with Popkov, and accordingly, Andersen has stated a plausible claim for relief against both

---

[26] These claims are not barred by the Illinois Tort Immunity Act because they do not arise under the common law, statutes or Constitution of Illinois. 745 ILCS 10/8-101(c).

Popkov and Gimbel arising from her unlawful detention and premised on the legal theory of conspiracy.

### C.     Intentional Infliction of Emotional Distress

Finally, Andersen asserts that Kharasch, Gimbel, and Popkov are each liable for intentional infliction of emotional distress ("IIED"). Under Illinois law, a plaintiff establishes liability for IIED by showing that "1) the defendant's conduct was extreme and outrageous, 2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and 3) the defendant's conduct did cause severe emotional distress." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006). Conduct is not extreme and outrageous unless it goes "beyond all bounds of decency" and is "considered intolerable in a civilized community." *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (citations omitted).

#### 1.     *Kharasch*

The Court can easily dispose of Andersen's claim against Dr. Kharasch. Count II alleges that Kharasch committed the tort of IIED by intentionally spreading derogatory and defamatory comments about her mental health with the knowledge that his position as chief of emergency medicine would lend him credibility. Kharasch, in response to questioning, allegedly told the Glenview Police Department that Andersen "was mentally ill" in hopes that she would be arrested and prosecuted.[27] Compl. ¶ 53. Even taken as true, this one statement—by the recipient of phone calls from Andersen complaining about Gimbel's conduct—made on one occasion is plainly not

---

[27] Andersen initially asserted that Kharasch's comment also gave rise to liability for defamation, but later acknowledged that a claim premised on defamation would be untimely and voluntarily dismissed Count I of the complaint as to Karasch. Andersen's Motion to Voluntarily Dismiss Count I Against Defendant Morris Kharasch, ECF No. 66. Accordingly, the Court does not address that theory here.

sufficient to constitute "extreme and outrageous" conduct. "Under Illinois law, liability for intentional infliction of emotional distress has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of human decency." *Cook v. Winfrey*, 141 F.3d 322, 331 (7th Cir. 1998) (collecting cases where Illinois courts dismissed defamation based IIED claims and affirming district court's finding that it was not extreme and outrageous to make false statements about plaintiff). A single unadorned statement of opinion that another is mentally ill—which is all the complaint alleges—does not rise to that level.

Andersen's citation to *Feltmeier v. Feltmeier*, 207 Ill. 2d 263 (2003) in support of her argument that Kharasch abused his power does not save her claim.[28] In *Feltmeier*, the Illinois Supreme Court upheld a claim by a wife against her abusive husband and acknowledged that successful IIED claims frequently involve defendants who stand in a position of power relative to the plaintiff. *Id.* at 273. It explicitly referenced, however, "the degree of power or authority which a defendant has ***over a plaintiff***" and cited IIED cases brought by employees against their employers or debtors against their creditors. *Id.* (citing *McGrath v. Fahey*, 126 Ill.2d 78, 86–87 (1988) (emphasis added). Andersen has not alleged that Kharasch has any power or authority over her. To the contrary, she repeatedly states that she has no relationship with him whatsoever. For

---

[28] The only other potentially relevant case from within this circuit that Andersen cites is *Rusinowski v. Village of Hillside*, 835 F. Supp. 2d 641, 656 (N.D. Ill. 2011), which involved a "malicious campaign," not a single false statement. Further, Andersen's argument that Kharasch violated the "Mental Health and Developmental Disabilities Confidentiality Act" is completely without merit. The Act protects only recipients of mental health services, and Andersen repeatedly states that she was not Dr. Kharasch's patient. Her request for leave to assert a claim under the Act is accordingly denied.

those reasons, the Court dismisses the IIED claim against Kharasch. As Count II was the only count Andersen directed against Kharasch, he is accordingly dismissed from the case.[29]

### 2. Detective Popkov

Andersen alleges that Popkov is liable for IIED because he made derogatory comments about her mental health in lieu of engaging in a good faith interrogation and aided Gimbel in his quest to obtain sole custody of the children by initiating criminal charges against Andersen. As noted above, the complaint fails to describe with particularity any statements Popkov made about Andersen's mental health, but putting that issue to the side, Andersen's IIED theory fails because it is barred by the Illinois Tort Immunity Act, which requires plaintiffs to bring civil actions against local government employees within one year of the date the cause of action accrued. 745 ILCS 8-101. The Seventh Circuit, analyzing Illinois law, has held that "a claim of intentional infliction of emotional distress in the course of arrest and prosecution accrues on the date of the arrest." *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013). The *Bridewell* court, relying on its prior decision in *Evans v. Chicago*, 434 F.3d 916, 934 (7th Cir. 2006), explained that the tort of IIED is not a continuing wrong.

Andersen, who filed her complaint more than a year after her September 2015 arrest, argues that her IIED claim did not accrue until the conclusion of the litigation. In support of her position, she points to the Illinois Supreme Court's 2003 *Feltmeier* decision, which held that the tort of IIED should be treated as a continuing wrong, and that a claim will not accrue until the date of the last injury suffered or when the tortious acts cease. 207 Ill. 2d at 284.[30] *Feltmeier* is distinguishable,

---

[29] As the Court has dismissed Kharasch from the case, his Motion for Summary Judgment, ECF No. 200, is denied as moot.

[30] Andersen also relies on *Parish v. City of Elkhart*, 614 F.3d 677, 683 (7th Cir. 2010), which held that an Indiana plaintiff's IIED claim did not accrue until his conviction was overturned. The Court stated that, under Indiana law, if the tort continued through the point of

however, as it involved a continuous course of conduct by a husband against his spouse rather, than as here, a discrete arrest by a police officer. The *Feltmeier* court took pains, moreover, to explain that continuing ill effects from an initial act does not serve to extend the statute of limitations under the "continuing wrong" theory. *Id*. at 278 ("A continuing violation or tort is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation."). And that is what Andersen alleges, at least as to Popkov: continuing emotional distress based on what she claims to have been his role in her unlawful arrest and the initiation of false charges against her. The complaint contains no allegations that Popkov orchestrated the prosecution in the year before she filed this law suit, so there is no basis on which to infer that Andersen's distress was anything other than the continuing ill effects of Popkov's prior conduct. *See Bridewell*, 730 F.3d at 678 ("The idea that failing to reverse the ongoing effects of a tort restarts the period of limitations has no support in Illinois law—or in federal law either."); *see also Friends-Smiley v. City of Chicago*, 16-CV-5646, 2016 WL 6092637, at *2 (N.D. Ill. Oct. 19, 2016) (collecting cases in which courts in this district have held that IIED claims against police officers accrue on the day of arrest even when intertwined with malicious prosecution claims). Accordingly, to the extent that Andersen's claim against Popkov is premised on an IIED theory, it is untimely as pleaded.

### 3. *Gimbel*

Andersen's IIED theories against Gimbel in Count II and Count XI arise from Gimbel's defamatory comments about Andersen's mental health to the police and third parties, his efforts to

---

conviction and would directly implicate the validity of the conviction (*i.e*, would only have been proper to assert while the conviction was still outstanding if brought through post-conviction relief channels), the claim would not accrue until the conviction had been disposed of in a manner favorable to the plaintiff. Because that case involved Indiana law and a wrongful conviction, it is inapposite to the case at bar.

have Andersen arrested and prosecuted, his requests to the State's Attorney that Andersen's mental health be evaluated, his refusal to drop frivolous criminal charges, and his attempt to provoke violations of a no contact bond order so that bond would be revoked. Gimbel argues that none of this alleged conduct is "extreme and outrageous," correctly noting that there is a "high bar for the type of conduct which will create liability." *Chang Hyun Moon v. Kang Jun Liu*, 44 N.E.3d 1134, 1143 (Ill. App. Ct. 2015). Illinois courts, however, have noted that a defendant's conduct must be assessed in view of all the facts and circumstances pleaded and that "[a] pattern, course, and accumulation of acts can make an individual's conduct sufficiently extreme to be actionable, whereas one instance of such behavior might not be." *Feltmeier*, 207 Ill. 2d at 274 (citing *McGrath*, 126 Ill.2d at 86–87 and *Pavlik v. Kornhaber*, 326 Ill.App.3d 731, 746 (2001)). The bar is high, but Andersen has cleared it in adequately alleging that Gimbel engaged in a campaign to have her falsely arrested and prosecuted so that she would lose custody over her children—surely a scenario that, if proven, qualifies as extreme and outrageous. The Court finds that Andersen's claims against Gimbel are actionable on a theory of intentional infliction of emotional distress.

*        *        *

To recap: Andersen has failed to state any claim against Dr. Kharasch or the Village of Glenview, so the Court grants their motions to dismiss the complaint. As for Detective Popkov, Andersen has stated a viable claim arising from her overnight detention based on her Fourth Amendment unreasonable detention and deprivation of familial relations theories, and her corresponding theories of conspiracy liability. Popkov's motion to dismiss is therefore denied as to that claim. It is granted, however, as to Andersen's claim based on her subsequent prosecution. Finally, based on IIED and conspiracy, Andersen has stated viable claims against Gimbel arising from the facts comprising her arrest and overnight detention claim and those comprising her

improper prosecution claim. Accordingly, Gimbel's motion to dismiss the complaint for failure to state a claim is denied. All dismissals are without prejudice but, because fact discovery has been completed, further consideration of any of the dismissed claims, or rejected theories, will occur in the context of a summary judgment motion or other pretrial motions in limine. A status hearing will be held on December 12, 2018, at 9:00 a.m. to discuss the scheduling of expert discovery and any further motion practice.

Date: November 28, 2018

John J. Tharp, Jr.
United States District Judge